**IN THE UNITED STATES BANKRUPTCY COURT FOR THE
EASTERN DISTRICT OF TENNESSEE**

In re

Case No.  13-32971

SHERRY A. HYLAND
aka SHERRY HYLAND PHILLIPS
dba NARNIA FARM

           Debtor

**MEMORANDUM ON MOTION FOR CONTEMPT AND
FOR TURNOVER AND MOTION TO MODIFY
<u>AUTOMATIC STAY AND COMPEL ABANDONMENT OF PROPERTY</u>**

**APPEARANCES:**    MAYER & NEWTON
        John P. Newton, Jr., Esq.
        1111 Northshore Drive
        Suite S-570
        Knoxville, Tennessee  37919
        Attorneys for Debtor

            AMBROSE, WILSON, GRIMM & DURAND, LLP
        Ronald L. Grimm, Esq.
        Post Office Box 2466
        Knoxville, Tennessee  37901-2466

            MOSTOLLER, STULBERG, WHITFIELD & ALLEN
        Ann Mostoller, Esq.
        Celia Hastings, Esq.
        136 South Illinois Avenue
        Suite 104
        Oak Ridge, Tennessee  37830
        Attorneys for LaChance Financial Services, Inc.

**RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE**

These contested matters are before the court on the following: (1) the Motion for Contempt, Motion for Turnover & Motion for Expedited Hearing (Motion for Contempt and Turnover) filed by the Debtor on August 20, 2013, asking the court to order LaChance Financial Services, Inc. (LaChance Financial) to return a 2006 Ford F-650 truck to the Debtor pursuant to 11 U.S.C. § 542 (2006), to find LaChance Financial in contempt for willfully violating the automatic stay and to award her actual and punitive damages pursuant to 11 U.S.C. § 362(k) (2006); and (2) the Motion to Modify Automatic Stay and For Order Compelling Trustee to Abandon Property (Motion for Stay Relief and Abandonment) filed on August 30, 2013, by LaChance Financial seeking, pursuant to 11 U.S.C. § 362(d) (2006), an order modifying the automatic stay to permit it to obtain possession of its collateral from the Debtor and directing the Chapter 13 Trustee to abandon any interest in the collateral pursuant to 11 U.S.C. § 554 (2006).

The trial on these contested matters was held on October 23, 2013. The record before the court consists of seventeen exhibits stipulated into evidence and the testimony of four witnesses, Harold C. Ward, Jr., Bradley Nuwsom, Norman LaChance, and the Debtor. Pursuant to the pretrial Order entered on October 2, 2013, and amended on October 15, 2013, by the Order - Alter or Amend Pretrial Order, the issues before the court are as follows: (A) whether LaChance Financial willfully violated the automatic stay of 11 U.S.C. § 362(a) and, if so, the amount of damages to which the Debtor is entitled to recover pursuant to 11 U.S.C. § 362(k)(1); (B) whether LaChance Financial should be required to turn over the 2006 Ford F-650 to the Debtor; (C) whether LaChance Financial is the owner of the 2006 Ford F-650 or whether the Debtor owns this vehicle subject to a security interest in favor of LaChance Financial; (D) whether LaChance Financial is entitled to modification of the automatic stay to permit it to obtain possession of the 2006 Ford F-650 vehicle which it

2

allegedly owns, or if it is determined that the Debtor is the owner of the vehicle, whether LaChance Financial is entitled to modification of the automatic stay to permit it to foreclose a lien encumbering the vehicle; (E) whether LaChance Financial is entitled to relief from the automatic stay to permit it to obtain possession of two horses together with any other of its collateral in the Debtor's possession and to foreclose its lien encumbering such collateral; and (F) alternatively, whether the Debtor has any legal, contractual, or other interest in the 2006 Ford F-650 including a financing agreement, executory contract, or otherwise which is protected under the automatic stay by § 362(a).

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (G), and (O) (2006).

**I**

On April 24, 2009, after experiencing financial difficulties including the repossession of the disputed Ford F-650 truck (Ford F-650), Narnia Farm, Inc. entered into an agreement with LaChance Financial whereby LaChance Financial paid $38,564.98 to Ford Motor Credit and purchased the Ford F-650 which it then leased back to Narnia Farm, Inc. TRIAL EX. 13. The Lease was executed on behalf of Narnia Farm, Inc. by the Debtor, its President. TRIAL EX. 13. Pursuant to the Lease, Narnia Farm, Inc. was to pay LaChance Financial a security deposit of $10,000.00 together with monthly payments in the amount of $1,518.50 for a term of 36 months. COLL. TRIAL EX. 7. In association with this transaction, the Debtor, again in her capacity as President of Narnia Farm, Inc., executed the Assignment of Certificate of Title by Owner in favor of LaChance Financial on August 13, 2009, thereby transferring any ownership interest in the Ford F-650 to LaChance Financial. COLL. TRIAL EX. 7.

On January 25, 2010, Narnia Farm, Inc. entered into a second Lease agreement with LaChance Financial, whereby Narnia Farm, Inc. leased a 2009 Nissan Murano (Murano) from LaChance Financial for $715.06 down and $715.06 per month for sixty months. COLL. TRIAL EX. 7. In connection with this transaction, the Debtor, as President of Narnia Farm, Inc., also executed an Equipment Finance Agreement with LaChance Financial under which Narnia Farm, Inc. received a $150,000.00 advance to be repaid in monthly installments of $3,755.00 for sixty months. COLL. TRIAL EX. 7. As collateral for the Equipment Finance Agreement, Narnia Farm, Inc. pledged the Ford F-650, a 2005 Ford F-350 truck (Ford F-350), and two horses, which is likewise reflected in a UCC Financing Statement filed with the Delaware Secretary of State on January 29, 2010. COLL. TRIAL EX. 7. In association with these transactions and as required by LaChance Financial, the Debtor executed a Corporate Leasing Resolution in which she certified that she was Secretary of Narnia Farm, Inc. and that she, as President, was authorized to negotiate and enter into the Lease and Equipment Finance Agreement with LaChance Financial. COLL. TRIAL EX. 7. Notwithstanding that the Debtor executed the Lease and Equipment Finance Agreement as President of Narnia Farm, Inc., a Delaware corporation, the Debtor stopped filing documentation with the Delaware Secretary of State in 2004, and ceased operating Narnia Farm, Inc. between 2005 and 2008, and Narnia Farm, Inc. was thereafter administratively dissolved by the State of Delaware in 2005.

In November 2010, the Debtor moved to Tennessee for employment, at which time she removed the collateral pledged to LaChance Financial from Massachusetts to Tennessee. After that employment ended in May 2012, the Debtor remained in Tennessee where she began teaching riding lessons and transporting horses for customers under the name of Narnia Farm, Inc. When she once again began suffering financial difficulties, the Debtor allowed the insurance on the Ford F-650, the

4

Ford F-350, and the Murano to lapse and their registrations to expire between 2010 and 2012, and stopped making payments under the Lease and Equipment Finance Agreement in December 2012, with the result that as of August 13, 2013, the outstanding balance owed to LaChance Financial was $262,205.33. TRIAL EX. 15. Exercising its rights under the Lease and Equipment Finance Agreement, LaChance Financial repossessed the Ford F-350 on April 3, 2013, and repossessed the Ford F-650 on August 14, 2013. TRIAL EX. 10.

The Debtor filed the Voluntary Petition commencing her Chapter 13 case on August 15, 2013. Her plan proposes monthly payments of $2,500.00, remittance of all tax refunds over $1,000.00, and a 6-20% dividend to unsecured creditors. The proposed plan also lists secured debts to LaChance Financial/Bankers Capital on the 2008 Nissan Murano and the 2006 Ford F-650, which are collectively valued at $75,000.00, with LaChance Financial to receive $1,470.00 monthly plus 5% interest, and another secured creditor, PNC Bank, who holds a lien on a 2004 Sundowner trailer valued at $25,000.00 to receive $550.00 monthly plus 5% interest. Although the Debtor, through counsel, has requested that it do so, LaChance Financial has not returned possession of the Ford F-650 to the Debtor on the basis that the truck is not property of the Debtor's bankruptcy estate. In support of her Motion for Contempt, the Debtor argues that she cannot operate her business without the Ford F-650 and that she has lost income in the amount of $26,109.50 from August 15 through October 16. *See* TRIAL EX. 9.

**II**

Upon the filing of the Debtor's case, all property and interests in property held by the Debtor became property of the estate. 11 U.S.C. § 541(a) (2006). Additionally, the automatic stay went

into effect, prohibiting all creditors from engaging in "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate," 11 U.S.C. § 362, and actions taken in violation of the stay are "invalid and voidable and shall be voided absent limited equitable circumstances." *Easley v. Pettibone Mich. Corp.*, 990 F.2d 905, 911 (6th Cir. 1993). Pursuant to § 542(a), any entity in possession or control of property of the estate is required to turn it over. "This is a mandatory duty arising upon the filing of the bankruptcy petition." *Harcher v. United States (In re Harcher)*, 393 B.R. 160, 172 (Bankr. N.D. Ohio 2008).

> [Section 542(a)'s] mandatory language squares with the language and impact of the automatic stay. By requiring a creditor to turn over property of the estate upon the filing of a bankruptcy petition, § 542(a) prevents the continued exercise of control over property of estates – a violation of the automatic stay. Thus, § 542(a) works to avoid what § 362(a) forbids – the retention of property of the estate after filing.

*Unified Peoples Fed. Credit Union v. Yates (In re Yates)*, 332 B.R. 1, 4 (B.A.P. 10th Cir. 2005) (footnote omitted). Additionally, under Sixth Circuit authority, a creditor who has repossessed property of the debtor must turn it over upon the filing of a bankruptcy petition, and the failure to do so "constitutes 'the exercise [of] control over property of the estate' for purposes of the automatic stay in 11 U.S.C. § 362(a)(3)[,]" such that a creditor's post-petition retention of repossessed property of the debtor may constitute a willful violation of the stay. *TranSouth Fin. Corp. v. Sharon (In re Sharon)*, 234 B.R. 676, 682, 688 (B.A.P. 6th Cir. 1999). "A violation is willful if 'the creditor deliberately carried out the prohibited act with knowledge of the debtor's bankruptcy case[,]'" and it is inconsequential whether the creditor possessed any specific intent to violate the stay – actual knowledge of the case creates strict liability and the presumption that the violation was deliberate or intentional. *In re Printup*, 264 B.R. 169, 173 (Bankr. E.D. Tenn. 2001) (citations omitted).

6

Although the actual events surrounding the repossession are in dispute – with LaChance Financial arguing that the Debtor voluntarily turned over the vehicle to its repossession agent – there is no dispute that on August 14, 2013, LaChance Financial, through its agent, took possession of the Ford F-650 from the Debtor, who then filed her Chapter 13 the following day, and that LaChance Financial remains in possession of the Ford F-650, refusing to return it to the Debtor. In support of its refusal, LaChance Financial argues that it – and not the Debtor – owns the Ford F-650 because the agreement between it and the Debtor's corporation, Narnia Farm, Inc., was a true lease rather than a security agreement and, therefore, the truck is not property of the Debtor's bankruptcy estate. In the event that the court determines that the Ford F-650 is property of the Debtor's estate, LaChance Financial argues that it is still within its rights not to return the truck because the Debtor has not adequately insured it.[1] Accordingly, the key element of both § 542(a) and 362(a)(3) at issue here is whether the Ford F-650 is property of the Debtor's bankruptcy estate.

Based upon the record, it is clear that the Ford F-650 is not property of the Debtor's bankruptcy estate, that LaChance Financial did not violate the automatic stay when it failed to return the truck to the Debtor, and that LaChance Financial is not required by turn over the Ford F-650 to the Debtor. First, the Lease, which was executed by the Debtor on May 15, 2009, in her capacity as President of Narnia Farm, Inc., expressly defines the transaction as follows:

> 4. STATUTORY FINANCE LEASE. Lessee agrees and acknowledges that it is the intent of both parties to this Lease that it qualify as a statutory finance lease under Article 2A of the Uniform Commercial Code. Lessee acknowledges and agrees that Lessee has selected both: (1) the Equipment; and (2) the supplier from whom Lessor is to purchase the Equipment. Lessee acknowledges that Lessor has not participated

---

[1] With respect to the insurance issue, per the documents received from Markel Insurance Company, the Ford F-650 is insured for the period of August 30, 2013 through August 30, 2014, although it is in the name of Narnia Farm, Inc., in care of the Debtor. TRIAL EX. 16.

7

in any way in Lessee's selection of the Equipment or of the supplier, and Lessor has not selected, manufactured or supplied the Equipment.

COLL. TRIAL EX. 7. The Lease also contains the following additional terms material to this contested matter:

12. OWNERSHIP; PERSONALTY. The Equipment is, and shall remain, the property of Lessor, and Lessee shall have no right, title, or interest in the Equipment except as expressly set forth in this Lease. . . . .

13. SURRENDER. By this Lease, Lessee acquires no ownership rights in the Equipment, and has no option to purchase same. Under the expiration, or earlier termination or cancellation of this Lease, or in the event of a default under Paragraph 21 hereunder, Lessee, at its expense, shall return the Equipment in good repair, ordinary wear and tear resulting from proper use thereof alone excepted, by delivering it, packed and ready for shipment, to such place or carrier as Lessor may specify.

. . . .

21. DEFAULT. Lessee shall be in default if: (a) Lessee shall fail to make any payment due under the terms of this Lease for a period of 10 days from the due date thereof; or (b) Lessee shall fail to observe, keep, or perform any provision of this Lease, and such failure shall continue for a period of 10 days; or (c) Lessee has made any misleading or false statement in connection with application for or performance of this Lease; or (d) The Equipment or any part thereof shall be subject to any lien, levy, seizure assignment, transfer, bulk transfer, encumbrance, application, attachment, execution, sublease, or sale without prior written consent of Lessor, or if Lessee shall abandon the Equipment or permit any other entity or person to use the Equipment without the prior written consent of Lessor; or (e) Lessee dies or ceases to exist; or (f) Lessee changes its name, state of incorporation, chief executive office and/or place of residence without providing Lessor with 30 days written notice of such change; or (g) Lessee defaults on any other agreement it has with Lessor; or (h) Any guarantor of this Lease defaults on any obligation to Lessor or any of the above listed events of default occur with respect to any guarantor or any such guarantor files or has filed against it a petition under the bankruptcy laws.

22. REMEDIES. If Lessee is in default, Lessor, with or without notice to Lessee, shall have the right to exercise any one or more of the following remedies, concurrently or separately, and without any election of remedies being deemed to have been made: (a) Lessor may enter upon Lessee's premises and without any court order or other process of law may repossess and remove the Equipment, or render the Equipment unusable without removal, either with or without notice to Lessee. Lessee hereby waives any trespass or right of action for damages by reason of such

>   entry, removal, or disabling. Any such repossession shall not constitute a termination of this Lease unless Lessor so notifies Lessee in writing; (b) Lessor may require Lessee, at its expense, to return the Equipment in good repair, ordinary wear and tear resulting from proper use thereof alone excepted, by delivering it, packed and ready for shipment to such place or carrier as Lessor may specify; (c) Lessor may cancel or terminate this Lease and may retain any and all prior payments paid by Lessee; (d) Lessor may declare all sums due and to become due under this Lease immediately due and payable, including as to any or all items of Equipment, without notice or demand to Lessee; (e) Lessor may re-lease the Equipment without notice to Lessee, to any third party, upon such terms and conditions as Lessor alone shall determine or may sell the Equipment, without notice to Lessee, at private or public sale, at which sale Lessor may be the purchaser; (f) Lessor may sue for and recover from Lessee the sum of all unpaid rents or other payments due under this Lease then accrued, all accelerated future payments due under this Lease, discounted to their present value at a discount rate of 5%, as of the date of default, plus Lessor's estimate at the time this Lease was entered into of Lessor's residual interest in the Equipment, reduced to present value at a discount rate of 5% as of the date of default, less the net proceeds of disposition, if any, of the Equipment; (g) To pursue any other remedy available at law, by statute or in equity, including without imitation the remedies in UCC 2A-523.
>   No right or remedy herein conferred upon or reserved to Lessor is exclusive of any other right or remedy herein, or by law or by equity provided or permitted, but each shall be cumulative of every other right or remedy given herein or now or hereafter existing by law or equity or by statute or otherwise, and may be enforced concurrently therewith or from time to time. No single or partial exercise by Lessor of any right or remedy hereunder shall preclude any other or further exercise of any other right or remedy. Lessee waives any and all rights and remedies which may be granted to it by Sections 508 through 522 of Article 2A of the UCC to the greatest extent permitted by law.

COLL. TRIAL EX. 7. As stated in the addendum to the Lease Agreement, "no item of leased equipment shall be moved or located in any State other than the State in which the equipment was delivered" without prior approval by LaChance Financial, and, as set forth in Exhibit A to the Lease, the Lease Agreement provides the following with respect to the F-650:

>   The above described equipment together with all current or hereinafter added accessories, attachments, additions, modifications, parts, improvements, enhancements and any current or future replacements or substitutions of any of the forgoing (the "Property"), such Property being subject to an equipment lease agreement (the "Lease") between the above named Lessee/Debtor as lessee and the above named Lessor/Secured Party as lessor. Lessor is the owner of the property and any and all proceeds thereof including insurance proceeds. LESSEE HAS NO

9

>    RIGHT TO SELL, EXCHANGE, ENCUMBER, OR OTHERWISE DISPOSE OF
>    OR RELEASE THE PROPERTY.

COLL. TRIAL EX. 7. Finally, and conclusively, the Certificate of Title to the Ford F-650, which originally named Narnia Farm, Inc. as the owner when it was purchased in January 2006, reflects that Narnia Farm, Inc., through the Debtor as its President, assigned ownership of the Ford F-650 to LaChance Financial on August 13, 2009. COLL. TRIAL EX. 7.

At trial, the Debtor testified that she understood the Equipment Finance Agreement executed on January 29, 2010, superseded the Lease for the Ford F-650 and is, therefore, determinative in establishing that the parties' transaction is no longer under the terms of a statutory Lease but a security interest relationship. On the other side, Mr. LaChance testified that Narnia Farm, Inc. entered into the Equipment Finance Agreement when it needed additional funds, against which the Debtor pledged two horses and the Ford F-350, and that the Ford F-650 is listed as collateral as a matter of convenience to merge the payments under the Lease Agreement and the Equipment Finance Agreement so that Narnia Farm, Inc. would have only two payments, the newly merged payment and the Murano Lease payment.

The record reflects that Equipment Finance Agreement was entered into by Narnia Farm, Inc. after the Debtor, as Secretary of Narnia Farm, Inc., executed a Board Resolution Authorization to Incur Indebtedness and Pledge Assets dated January 29, 2010, which Mr. LaChance testified was a standard form LaChance Financial required of corporate debtors. COLL. TRIAL EX. 7. The Equipment Finance Agreement lists the Ford F-650 among the collateral pledged by Narnia Farm, Inc. to LaChance Financial, along with a 2005 Ford F-350 truck and two horses. COLL. TRIAL EX. 7. Additionally, the Equipment Finance Agreement states that Narnia Farm, Inc. was granting

10

LaChance Financial "a security interest under the Uniform Commercial Code for the . . . [collateral]. Such security interest is granted to secure performance by Debtor of its obligations hereunder and under any other present or future agreement with Creditor. Debtor shall insure that such security interest is and shall remain a sole first lien security interest." COLL. TRIAL EX. 7. LaChance Financial's security interest is also reflected in a UCC Financing Statement filed on January 29, 2010, with the Delaware Secretary of State. COLL. TRIAL EX. 7.

Massachusetts law governs the Equipment Finance Agreement and defines "security interest" as follows:

> (37) "Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation. The term also includes any interest of a consignor and a buyer of accounts, chattel paper, a payment intangible, or a promissory note in a transaction that is subject to Article 9. The special property interest of a buyer of goods on identification of those goods to a contract for sale under Section 2-401 is not a "security interest", but a buyer may also acquire a "security interest" by complying with Article 9. Except as otherwise provided in Section 2-505, the right of a seller or lessor of goods under Article 2 or 2A to retain or acquire possession of the goods is not a "security interest" but a seller or lessor may also acquire a "security interest" by complying with Article 9. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (Section 2-401) is limited in effect to a reservation of a "security interest".
>
> Whether a transaction creates a lease or "security interest" is determined by the facts of each case; however, a transaction creates a "security interest" if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and:
>
> (a) the original term of the lease is equal to or greater than the remaining economic life of the goods,
>
> (b) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods,
>
> (c) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement, or

11

(d) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

A transaction does not create a "security interest" because it provides that:

(a) the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or greater than the fair market value of the goods at the time the lease is entered into,

(b) the lessee assumes risk of loss of the goods, or agrees to pay taxes, insurance, filing, recording, or registration fees, or service or maintenance costs with respect to the goods,

(c) the lessee has an option to renew the lease or to become the owner of the goods,

(d) the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed, or

(e) the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

For purposes of this subsection:

(a) Additional consideration is not nominal if (i) when the option to renew the lease is granted to the lessee the rent is stated to be the fair market rent for the use of the goods for the term of the renewal determined at the time the option is to be performed, or (ii) when the option to become the owner of the goods is granted to the lessee the price is stated to be the fair market value of the goods determined at the time the option is to be performed. Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised;

(b) "Reasonably predictable" and "remaining economic life of the goods" are to be determined with reference to the facts and circumstances at the time the transaction is entered into; and

(c) "Present value" means the amount as of a date certain of one or more sums payable in the future, discounted to the date certain. The discount is determined by the interest rate specified by the parties if the rate is not manifestly unreasonable at the time the transaction is entered into; otherwise, the discount is determined by a commercially reasonable rate that takes into account the facts and circumstances of each case at the time the transaction was entered into.

MASS. GEN. LAWS ANN. ch. 106 § 1-201.  To determine the true nature of a document under this statute, courts consider the following factors:

> (1) whether there was an option to purchase for a nominal sum, (2) whether there was a provision in the lease granting the lessee an equity or property interest in the equipment, (3) whether the nature of the lessor's business was to act as a financing agency, (4) whether the lessee paid a sales tax incident to acquisition of the equipment, (5) whether the lessee paid all other taxes incident to ownership of the equipment, (6) whether the lessee was responsible for comprehensive insurance on the equipment, (7) whether the lessee was required to pay any and all license fees for operation of the equipment, and to maintain the equipment at his expense, (8) whether the agreement placed the entire risk of loss upon the lessee, (9) whether the agreement included a clause permitting the lessor to accelerate the payment of rent upon default of the lessee and granted remedies similar to those of a mortgagee, (10) whether the equipment subject to the agreement was selected by the lessee and purchased by the lessor for this specific lessee, (11) whether the lessee was required to pay a substantial security deposit in order to obtain the equipment, (12) whether the agreement required the lessee to join the lessor, or permit the lessor by himself, to execute a UCC financing statement, (13) whether there was a default provision in the lease inordinately favorable to the lessor, (14) whether there was a provision in the lease for liquidated damages, (15) whether there was a provision disclaiming warranties of fitness and/or merchantability on the part of the lessor [and], (16) whether the aggregate rentals approximate the value or purchase price of the equipment.

*In re Rowe*, 369 B.R. 73, 78-79 (Bankr. D. Mass. 2007).

Notwithstanding that the Equipment Finance Agreement purports to pledge the Ford F-650 as collateral and grant LaChance Financial a security interest therein, the fact remains that in January 2010, Narnia Farm, Inc. did not own the Ford F-650, having assigned its ownership interest in the truck to LaChance Financial in August 2009.  It could not, therefore, have given LaChance Financial or any other entity a security interest in the Ford F-650.  At most, all Narnia Farm, Inc. had at that time was a possessory interest under the terms of the Lease, which Lease gave LaChance Financial the right to repossess the Ford F-650 in the event of default, including nonpayment of the Lease, failure to keep the truck insured, and moving the vehicle out of Massachusetts.  The Equipment

Finance Agreement did, however, grant LaChance Financial a security interest in the Ford F-350 and the two horses, which are not subject to the Lease Agreement and were not owned by LaChance Financial.

Additionally, even if the court found that LaChance Financial did not own the Ford F-650, it would still not be property of the Debtor's bankruptcy estate because it was owned by Narnia Farm, Inc. and not the Debtor, individually. The record reflects that although Narnia Farm, Inc. was administratively dissolved by the State of Delaware in 2005, the Debtor was not aware of its dissolution, and continued to operate Narnia Farm, Inc. as if it were still in good corporate standing, including but not limited to, entering into the Lease Agreement and later the Equipment Finance Agreement with LaChance Financial. Under Delaware law, "[a]ll corporations, whether they expire by their own limitation or are otherwise dissolved, shall nevertheless be continued, for the term of 3 years from such expiration or dissolution or for such longer period . . . for the purpose of . . . enabling them gradually to settle and close their business, to dispose of and convey their property, to discharge their liabilities and to distribute to their stockholders any remaining assets, but not for the purpose of continuing the business for which the corporation was organized." 8 DEL. CODE § 278. After payment of all claims from all assets, remaining assets are distributed to the stockholders. 8 DEL. CODE § 281. Here, because there was a substantial debt of $262,205.33 owed by Narnia Farm, Inc. to LaChance Financial, its obligations to LaChance Financial would have to be satisfied before any remaining assets went to the Debtor. There were insufficient assets to satisfy LaChance Financial's claim, therefore, none of Narnia Farm, Inc.'s property would have succeeded to the Debtor, and therefore, none of it would have been property of her estate and subject to the

14

automatic stay. Accordingly, although any interest held by the Debtor in Narnia Farm, Inc. would be property of her bankruptcy estate, any property held by Narnia Farm, Inc. would not be.

### III

LaChance Financial seeks modification of the automatic stay to obtain possession of the two horses owned by the Debtor and its remaining collateral under the Equipment Finance Agreement. The request for stay relief is governed by 11 U.S.C. § 362(d), which states, in material part:

> (d)  On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; [or]
>
> (2) with respect to a stay of an act against property under subsection (a) of this section, if—
>
> (A) the debtor does not have an equity in such property; and
>
> (B) such property is not necessary to an effective reorganization;

11 U.S.C. § 362(d) (2006). Although LaChance Financial argued to the contrary, it did not produce any evidence to refute the Debtor's testimony that she, individually, owns the two horses which are, therefore, property of her bankruptcy estate under § 541(a).

A creditor may be entitled to relief from the stay "if there is insufficient equity in the property to adequately protect the creditor." *Martens v. Countrywide Home Loans (In re Martens)*, 331 B.R. 395, 398 (B.A.P. 8th Cir. 2005).

> The determination of whether a creditor's interest is adequately protected is not an exact science nor does it involve a precise arithmetic computation. Rather, it is pragmatic and synthetic, requiring a court to balance all relevant factors in a particular case, including the value of the collateral, whether the collateral is likely

15

>to depreciate over time, the debtor's prospects for a successful reorganization and the debtor's performance under the plan. Other considerations may include the balancing of hardships between the parties and whether the creditor's property interest is being unduly jeopardized. *In re Rogers*, 239 B.R. 883, 887 (Bankr. E.D. Tex. 1999) (citing *In re Olick*, 221 B.R. 146, 161 (Bankr. E.D. Pa. 1998)). A secured creditor retains the right to 'adequate protection' of its collateral, which means it is entitled to have the value of its collateral maintained at all times, and it can obtain relief from the automatic stay and take back its collateral at any time if that interest is not adequately protected or for other 'cause.' *Price v. Del. State Police Fed. Credit Union (In re Price)*, 370 F.3d 362, 373 (3d Cir. 2004).

*In re Bushee*, 319 B.R. 542, 551-52 (Bankr. E.D. Tenn. 2004). Relief under subsection (d)(1) requires the creditor to establish a *prime facie* case demonstrating that the debtor owes a debt to the creditor, that the creditor possesses a valid security interest securing the debt, and that the collateral securing the debt is declining in value while the debtor has failed to provide the creditor with adequate protection of its interest in the collateral. *In re Harrington*, 282 B.R. 637, 638 (Bankr. S.D. Ohio 2002). Relief under subsection (d)(2) is granted against estate property "if the debtor does not have equity in such property and such property is not necessary to an effective reorganization." *Rodriguez Camacho v. Doral Fin. Corp. (In re Rodriguez Comacho)*, 361 B.R. 294, 299 (B.A.P. 1st Cir. 2007). In any request for stay relief, the moving creditor bears the burden of proof that the property lacks equity, and the debtor must prove all other elements, including that the property is necessary for reorganization. 11 U.S.C. § 362(g) (2006). In the context of the Bankruptcy Code, equity is defined as "the value, above all secured claims against the property, that can be realized from the sale of the property for the benefit of the unsecured creditors." *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 392 (6th Cir. 1986).

In conjunction with its request for stay relief, LaChance Financial also requests that the court direct the Chapter 13 Trustee to abandon the estate's interest in the horses so that it may obtain possession of them. Upon the request of a party in interest, the court may order the Chapter 13

16

Trustee to abandon property of the estate provided that party in interest meets its burden of proof and presents a *prima facie* case that the property is burdensome to the estate or of inconsequential value. 11 U.S.C. § 554(b) (2006). Nevertheless, "[a]bandonment should only be compelled in order to help the creditors by assuring some benefit in the administration of each asset[,]" and a lack of equity does not, in and of itself, necessitate a determination that it is burdensome or of inconsequential value and benefit to the estate since "'benefit' does not mean the same as present 'value.'" *Morgan v. K.C. Mach. & Tool Co. (In re K.C. Mach. & Tool Co.)*, 816 F.2d 238, 245-46 (6th Cir. 1987). Instead, the focus is on "whether there is a reason that the estate's interest in the property should be preserved or, instead, whether the property is so worthless or burdensome to the estate that it should be removed therefrom[,]" and if the property will, at any time, provide a benefit to the estate, abandonment will not generally be ordered. *K.C. Mach. & Tool Co.*, 816 F.2d at 246-47 (quoting *In re Tyler*, 15 B.R. 258, 261 (Bankr. E.D. Pa. 1981)).

As an initial matter, LaChance Financial did not offer any evidence concerning the value of the horses. It did not, therefore, meet its burden of proving a lack of equity and is not entitled to any relief under § 362(d)(2). With respect to its request for relief under § 362(d)(1), however, the court finds that the Debtor has not met her burden of proving that LaChance Financial's interests are adequately protected because, as the Debtor testified at trial, the horses are not – and never have been – insured. This lack of insurance clearly constitutes a lack of adequate protection. That determination notwithstanding, LaChance Financial did not prove that the horses are burdensome and of inconsequential value to the Debtor's estate as required by § 554(b).

Although § 362(d) mandates that the court grant relief if one of its subsections is satisfied, it does not mandate that the stay be terminated; instead "§ 362(d) affords the Court discretion to

17

'condition' the continuance of the stay." *Brown Bark I L.P. v. Ebersole (In re Ebersole)*, 440 B.R. 690, 701 (Bankr. W.D. Va. 2010); *see also In re Trigee Foundation, Inc.*, 2013 WL 1401889, at *3, 2013 Bankr. LEXIS 1432, at *10 (Bankr. D. Dist. Col. Apr. 8, 2013) ("The court has discretion, however, to condition the automatic stay instead of lifting it outright."). Because the Debtor is in a Chapter 13 bankruptcy and has proposed a plan that contemplates payment to LaChance Financial, the automatic stay shall remain in effect but is conditioned upon the Debtor, within fourteen days, obtaining insurance on the horses with LaChance Financial named as loss-payee and providing the court and LaChance Financial with proof thereof. In the event that the Debtor has not complied within that time, the stay shall be terminated to allow LaChance Financial to take possession of and foreclose its lien encumbering the two horses, without further action by LaChance Financial or further order of the court. The Chapter 13 Trustee shall not, however, be directed to abandon the estate's interest in the horses. In the event LaChance Financial liquidates its interest in the horses for a sum in excess of its debt, the surplus would remain property of the estate and be remitted to the Chapter 13 Trustee for payment to creditors under the plan.

## IV

In summary, the court finds that the Ford F-650, which is owned by LaChance Financial, is not property of the Debtor's estate. Accordingly, the Ford F-650 was not covered by the automatic stay which went into effect upon the Debtor's bankruptcy filing on August 15, 2013, and the Motion for Contempt and Turnover filed by the Debtor on August 20, 2013, shall be denied. LaChance Financial is not required to return the Ford F-650 to the Debtor. The court also finds that because the horses serving as collateral under the Equipment Finance Agreement executed on January 29, 2010, are not insured, LaChance Financial is not adequately protected, and it is entitled to stay relief

under 11 U.S.C. § 362(d)(1) as requested in its Motion for Stay Relief and Abandonment filed on August 30, 2013, which shall be granted in part and denied in part. The automatic stay shall remain in effect conditioned on the Debtor insuring the horses within fourteen days and providing proof thereof to LaChance Financial that it is designated as loss-payee on the policy. In the event the Debtor does not comply, the automatic stay shall be terminated without further notice or hearing, but the Chapter 13 Trustee shall not be ordered to abandon the estate's interest in the horses pending confirmation and implementation of the Debtor's proposed Chapter 13 plan. With regard to other collateral in possession of the Debtor securing the LaChance Financial lien, stay relief will be granted.

An Order consistent with this Memorandum will be entered.

FILED: November 12, 2013

> BY THE COURT
>
> /s/ RICHARD STAIR, JR.
>
> RICHARD STAIR, JR.
> UNITED STATES BANKRUPTCY JUDGE